# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Delaware Riverkeeper Network, | : | |
| Clean Air Council, David Denk, | : | No. 1229 C.D. 2015 |
| Jennifer Chomicki and Joann Groman | : | Argued: November 14, 2016 |
| | : | |
| v. | : | |
| | : | |
| Middlesex Township Zoning | : | |
| Hearing Board | : | |
| | : | |
| v. | : | |
| | : | |
| R.E. Gas Development, LLC and | : | |
| Middlesex Township | : | |
| | : | |
| Appeal of: R.E. Gas Development, LLC | : | |

| | | |
|---|---|---|
| Delaware Riverkeeper Network, | : | |
| Clean Air Counsel, David Denk | : | No. 1323 C.D. 2015 |
| and Jennifer Chomicki | : | |
| | : | |
| v. | : | |
| | : | |
| Middlesex Township Zoning | : | |
| Hearing Board | : | |
| | : | |
| v. | : | |
| | : | |
| R.E. Gas Development, LLC and | : | |
| Middlesex Township and | : | |
| Robert G. Geyer | : | |
| | : | |
| Appeal of: Robert G. Geyer | : | |

| Delaware Riverkeeper Network, | : | |
| Clean Air Council, David Denk, | : | No. 2609 C.D. 2015 |
| Jennifer Chomicki, and Joann | : | |
| Groman, | : | |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| Middlesex Township Zoning | : | |
| Hearing Board | : | |
| | : | |
| v. | : | |
| | : | |
| R.E. Gas Development, LLC, | : | |
| Middlesex Township, and Robert G. | : | |
| Geyer | : | |

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                    HONORABLE MICHAEL H. WOJCIK, Judge
                    HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WOJCIK                                          FILED:  June 7, 2017

Objectors[1] appeal the order of the Butler County Court of Common

Pleas (trial court) denying their appeal of the Middlesex Township (Township)

Zoning Hearing Board's (Board) decision that denied their substantive challenge to

the Township's Ordinance 127 and denied their appeal of the zoning permit that

---

[1] The Objectors are the Delaware Riverkeeper Network (DRKN), the Clean Air Council (CAC), and David Denk, Jennifer Chomicki, and Joann Groman, landowners in Weatherburn Heights Planned Residential Development in Middlesex Township near the well site.

the Township issued to R.E. Gas Development, LLC (Rex). Rex and Robert G. Geyer (Geyer) appeal the stays that the trial court issued during the pendency of the appeal of the Board's decision. We affirm the order that affirmed the Board's decision and dismiss the appeals of the trial court's stay order.

The farm property owned by Robert G. Geyer is along the south side of the east-west Route 228 corridor in the Township near its boundary with Adams Township and is near the Weatherburn Heights (Weatherburn) Planned Residential Development (PRD). In November 2012, the Township's Board of Supervisors enacted Ordinance 125 creating the R-AG Residential Agriculture Zoning District, a mixed use district, to limit suburban growth and the location of PRD developments from a majority of the zoning districts in the Township.[2] The Geyer

---

[2] Ordinance 125 added Section 175-243 to the Township's Zoning Ordinance which states that the purpose of the R-AG Zoning District "is to provide for agricultural uses, low-density residential development and planned higher density development in areas where the general character is defined by rural areas which are in close proximity to major roads, infrastructure and areas near existing concentrated residential development and to provide for compatible public, semipublic and accessory uses as conditional uses or uses by special exception." Reproduced Record (R.R.) at 1760a. Ordinance 125 also added Section 175-244(A)(1) to the Zoning Ordinance providing the following permitted principal uses in the R-AG Residential Agriculture District: farms; greenhouse or tree nursery; single-family dwellings; two-family dwellings; government buildings; municipal firehouses; schools; public utilities, except buildings; and municipal recreation. *Id.* In turn, Section 175-8 defines "public utility" as:

> A. Any person or corporation now or hereafter owning or operating in this commonwealth equipment or facilities for:
>
> (1) Producing, generating, transmitting, distributing or furnishing natural or artificial gas, electricity or steam for the production of light, heat or power to or for the public for compensation.
>
> (2) Diverting, developing, pumping, impounding, distributing or furnishing water to or for the public for compensation.

**(Footnote continued on next page…)**

2

farm is located in the R-AG Residential Agriculture District and Rex has leased the oil and gas underlying Geyer's property.

In August 2014, the Township's Board of Supervisors enacted Ordinance 127 over the objection of the Township's Planning Commission. Ordinance 127 states that the "Township Zoning Ordinance as currently written does not expressly provide for the use or regulation of oil and gas operations" and the "Township Board of Supervisors desires to expressly provide for the use and regulation of oil and gas operations within the Township." Reproduced Record (R.R.) at 34a. Ordinance 127 allows for "oil and gas well site development" as a

---

**(continued…)**

* * *

> (5) Transporting or conveying natural or artificial gas, crude oil, gasoline or petroleum products, materials for refrigeration, or oxygen or nitrogen or other fluid substance by pipeline or conduit for the public for compensation.
>
> (6) Sewage collection, treatment or disposal for the public for compensation.
>
> (7) Conveying or transmitting messages or communications, except as excluded below, by telephone, telegraph or domestic public land mobile radio service, including, but not limited to, point-to-point microwave radio service for the public for compensation.

*Id.* at 1594a-1595a. However, Section 175-8 also provides that "[t]he term 'public utility' shall not include . . . [a]ny producer of natural gas not engaged in distributing such gas directly to the public for compensation." *Id.* at 1595a. Finally, Section 175-8 defines "public utility building" as "[a]ny administrative, maintenance, storage or service building operated by a public utility." *Id.* In addition, Section 175-8 defines "structure" as "[a]ny man-made object having an ascertainable stationary location on or in land or water, whether or not affixed to the land." *Id.* at 1598a.

3

permitted principal and accessory use in the AG-A Rural Residential District;[3] AG-B Agricultural District; I-1 Restricted Industrial District; and the R-AG Residential Agriculture District; and as a conditional use in the C-2 Highway Commercial District; TC Town Center District; and C-3 Regional Commerce District. The ordinance provides natural gas compressor stations as a permitted use in the I-1 Restricted Industrial District and as a conditional use in the AG-A Residential District; AG-B Agricultural District; C-2 Highway Commercial District; TC Town Center District; and C-3 Regional Commerce District. The ordinance also provides natural gas processing plants as a conditional use in the I-1 Restricted Industrial and C-3 Regional Commerce Districts. *See* R.R. at 48a.[4]

In September 2014, the Pennsylvania Department of Environmental Protection (DEP) issued well permits for drilling on the Geyer farm (Geyer site). The Township also granted Rex's application for a zoning permit for the drilling.

In October 2014, Objectors filed a substantive validity challenge to Ordinance 127 and an appeal of the zoning permit, which the Board consolidated

---

[3] Ordinance 127 added the definition of "oil and gas well site development" to Section 175-8 of the Township's Zoning Ordinance which is defined as "well location assessment, including seismic operations, well site preparation, construction, drilling, water or fluid storage operations, hydraulic fracturing and site restoration associated with an oil and gas well of any depth. The term includes conventional (vertical) and non-conventional (horizontal) methods of drilling." R.R. at 35a.

[4] Ordinance 127 also added Section 175-155.2 to the Zoning Ordinance which imposes a number of restrictions and requirements with respect to oil and gas well site development including: a 10-acre minimum lot size; compliance with state and federal regulations; access roads; traffic safety; dust control measures; noise standards; light restrictions; water storage requirements; limits to times of operation; signage and site identification; and any other restrictions necessary for the grant of a conditional use. *See* R.R. at 38a-45a.

for disposition.[5]   In the substantive validity challenge, Objectors claimed that Ordinance 127:  (1) violates Article 1, Section 1 of the Pennsylvania Constitution[6] because it was not designed to protect the health, safety, morals, and public welfare of its citizens and, therefore, is not a valid exercise of the Township's police power; (2) violates Article 1, Section 1 by injecting incompatible industrial uses into a non-industrial zoning district in violation of the Township's Comprehensive Plan thereby making the ordinance irrational; and (3) unreasonably infringes on their rights under Article 1, Section 27 of the Pennsylvania Constitution[7] to clean air, pure water, and a healthy local environment in which to live, work, recreate, and raise their children.[8]

---

[5] Rex and MarkWest Liberty Midstream & Resources (MarkWest), a natural gas gathering, processing and transportation company, intervened in the proceedings.

[6] Article 1, Section 1 states, in relevant part, that "[a]ll men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property . . . and of pursuing their own happiness."  Pa. Const. art. I, §1.

[7] Article 1, Section 27 states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment.  Pennsylvania's public natural resources are the common property of all the people, including generations yet to come.  As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27.

[8] In their appeal of the zoning permit issuance, Objectors raised similar claims, asserting that the Township's approval of the Geyer site well pad development:  (1) violates their rights under Article 1, Section 1 by injecting an incompatible industrial use with industrial standards into a zoning district where there is no expectation of industrial activity and where it will cause a
**(Footnote continued on next page…)**

5

The Board held nine public hearings at which the parties presented expert and lay testimony and evidence. Development at the Geyer site was stayed during the proceedings.

David Denk, one of the Objectors and a member of DRKN and CAC, testified that he lives in Weatherburn with his wife and two children approximately 1200 feet from the Geyer site. He stated that he did not expect industrial activity from a well pad at the Geyer site when he purchased his house and he did not check with the Township to see if a well site was a permitted use. He said that he had retained the mineral rights in his property, but that he had concerns about the health impact of fracking activities if they take place nearby. The Board accepted Denk's testimony as credible.

Robert Zaccari, a member of DRKN and CAC, testified that in 2011, he purchased his house in Weatherburn and understood that the area is zoned for residential and agricultural uses. He acknowledged that residential construction in Weatherburn has been ongoing since he moved there, but that well pad construction is more intense. He stated that he did not know that the Township has a noise ordinance and that he refused to lease his subsurface rights to Rex. He said that he is concerned that well pad activity will impact the future value of his home, but he did not know to what extent. The Board accepted Zaccari's testimony as credible.

Kathleen Wagner lives on Denny Road in the Township and is opposed to the well pad at the Geyer site. However, she stated that she signed a

_____

**(continued…)**

nuisance; (2) violates their rights under Article 1, Section 27 to a healthy community in which to live; and (3) breached the Township's obligations as trustee under Article 1, Section 27.

6

gas lease with Rex and was paid by Rex so the Board found the remainder of her testimony to be not credible.

Henrich Hartge testified that he resides in Weatherburn with his wife and daughter and that he is most worried about an explosion from fracking activities. The Board found that his concern, although not entirely outside the realm of possibility, was exaggerated for purposes of the hearing and not credible.

Crystal Yost testified that she lives with her husband and children approximately 1300 feet from an operating Rex fracking facility, the Reno Well. The Board found that her testimony was not credible because she substantially exaggerated her testimony and was evasive.

Melissa Brown testified that she lives with her husband and daughter on Forsyth Road adjacent to an oil and gas pipeline. She stated that she has concerns about the pipeline near the rear of her property contaminating the environment, her water well and her trees. However, she signed a subsurface gas lease with Rex and the Board found her testimony to be not credible.

Michael Endler, Rex's vice president and regional manager, testified regarding the construction activities and the timetable for the construction of a well pad. However, the Board found that his testimony was not credible because he was combative and evasive on cross-examination.

Jane Hawkins Peterson testified that she lives in the Township with her husband and is a part owner of a farm property that is leased to Rex and also to MarkWest for a pipeline. She stated that leasing the land for oil and gas financially helps her property remain agricultural, as opposed to being developed for residential uses. The Board accepted her testimony as credible.

7

Catherine Morely testified that she lives in the Township and her father's farm is the site of an existing Rex well pad, the Ferree well site. She stated that she lives 1900 feet from the Reno well site and 1900 feet from the Ferree well site. She said that her family's farming operations continue around the Ferree well site and the intrusion of the well pad drilling and construction was minimal. The Board accepted her testimony as credible.

Janice Kennedy testified that she lives adjacent to Weatherburn and would be approximately 1,015 feet from the Geyer well pad, the closest residence to the pad. She said that she began living in the area before residential construction in Weatherburn and that there has been ongoing construction from 2010. She stated that she considers the residential development to be a greater concern than the Geyer well pad due to increased lighting, ongoing construction, and denser population. She acknowledged that she has a subsurface lease with Rex and that she has no objection to the construction of the well pad and fracking for gas and oil at the Geyer site. The Board accepted her testimony as credible.

Scott Fodi, the Township's manager and zoning officer, testified that the Township's Zoning Ordinance was silent as to oil and gas facilities prior to the enactment of Ordinance 127 so the Township was at risk for such facilities being permitted in every district due to exclusionary zoning. He stated that oil and gas leasing reached a peak in intensity in the Township around the time the General Assembly enacted the Pennsylvania Oil and Gas Act (Act 13),[9] and that 80% of the properties in the Township are now leased for oil and gas development. He said that after this Court held that the zoning provisions in Act 13 were invalid in *Robinson Township v. Commonwealth*, 52 A.3d 463 (Pa. Cmwlth. 2012) (*Robinson*

[9] 58 Pa. C.S. §§2301-3504.

8

*I*), *aff'd in part and rev'd in part*, 83 A.3d 901 (Pa. 2013) (*Robinson II*), the Township's Board of Supervisors directed him to develop an oil and gas development zoning ordinance for the Township. He testified that he submitted the draft ordinance to the Township's Planning Commission in June 2014. He stated that, in July 2014, the Commission voted to request the Board of Supervisors to postpone a vote on the draft ordinance for one month, but that the Board enacted Ordinance 127 in August 2014, nonetheless. The Board accepted his testimony as credible.

Thomas Daniels, Objectors' land use expert, asserted that Ordinance 127 is not valid because it is not consistent with the Township's current joint Comprehensive Plan with Richland Township. He calculated that Ordinance 127 opens up 90.2% of the Township to oil and gas development, but he did not provide a basis for this calculation. He opined that oil and gas operations constitute a heavy industrial use associated with noise, odor, dust, pollution, fires and evacuations, which is inconsistent with the residential and agricultural uses in the R-AG Zoning District.[10]

Attorney William Sittig, the Township's and Rex's land use expert,[11] asserted that oil and gas operations include industrial components, but cannot be

---

[10] Objectors also offered Jay Parrish as an expert in geology and geography. However, the Board found that "Dr. Parrish's methodology is not generally accepted in the relevant field" and that "he admitted that the opinion he was offering is not supported by any scholarly support and is indeed 'novel.' [R.R. at 1911a]." R.R. at 1773a. As a result, the Board determined that "[Objectors] failed to lay a proper foundation to establish the acceptance of [] Parrish's methods and conclusions," "decline[d] to accept [] Parrish as an expert," and "rejected [his testimony] *in toto*." *Id.*

[11] Objectors objected to Sittig's testimony as an expert in land use law and planning and ordinance analysis. The Board noted that Sittig "has a Bachelor's Degree in mechanical engineering as well as a Juris Doctorate," that "[h]e has extensive experience in land use **(Footnote continued on next page…)**

characterized as a heavy industrial use. He opined that Daniels only focused on a temporary period of industrial development and did not take into account the entire lifespan of a well pad during drilling operations and the post-reclamation period. He disputed Daniels' assertion regarding breadth of development, stating that less than 30% of the land in the Township can be drilled pursuant to Ordinance 127. With respect to the Township's Comprehensive Plan, Sittig asserted that the issue is whether Ordinance 127 is a valid exercise of Township power and not whether it fell within the plan's framework. The Board accepted Sittig's testimony as credible.

Daniel Carpenter, Objectors' public health expert, opined that there is a public risk for significant contamination by pollutants within a two-mile radius of a well pad based on his examination of studies relevant to fracking. However, the Board found that his opinion is based on flawed data and failed to take into account contrary studies.

Julie Panko, Rex's expert in human health risk assessments, conducted a study of the fracking operations at Fort Cherry High School in Washington County, from which she determined that the release of chemical pollutants into the air during fracking and flaring do not significantly exceed the

---

**(continued…)**

planning issues as counsel for both municipalities and developers," and that "[h]is methodology is generally accepted in the field." R.R. at 1773a. The Board stated that "[t]he issue with Mr. Sittig is whether he can 'bring to the table' specialized knowledge beyond the scope of a layperson" and that "[a]s a general rule, expert testimony on questions of law is not permitted." *Id.* (citations omitted). Nevertheless, the Board accepted Sittig as an expert explaining that "during closing, counsel for [CAC] relied on, in large part, the testimony of Attorney Sitting in support of its own case, thereby waiving its objection," and "reserve[d] to itself . . . any decision as to questions of law." *Id.* at 1774a.

background concentrations or health-based exposure limits. She opined that the oil and gas production authorized by Ordinance 127 does not constitute a risk to public health or neighboring residents, contradicting Carpenter's opinion. However, the Board found that her studies did not consider a number of emission sources and failed to include a variety of pollutants caused by gas development including contaminant volatile organic chemicals.

Dana Bowen, Objectors' expert in noise assessment, prepared a study in which she concluded that the predicted noise levels would be 65 to 75 dBa at the Geyer site and would not reach 60 dBa for a distance of 3,200 feet from the site. She opined that sound mitigation techniques such as barriers would not effectively mitigate the noise. However, the Board found that she did not undertake any noise measurements at the Geyer site, did not accurately locate the position of the proposed well pad, and assumed that all equipment would be running simultaneously from the same spot and not arrayed across the site.

Ultimately, the Board rejected the expert testimony of Carpenter, Panko, and Bowen, stating that "[i]t is apparent from cross-examination that of these three scientific expert witnesses, each failed to take into account underlying data that did not support their conclusions, chose to take shortcuts in their research by only utilizing favorable data and overlooked or substantially downplayed inconvenient data." R.R. at 1784a-1785a. As a result, the Board found that "Dr. Carpenter, Ms. Panko and Ms. Bowen are not credible witnesses." *Id.* at 1785a.

In disposing of Objectors' claims, the Board initially explained that the Township's Board of Supervisors is granted the authority to amend its Zoning

11

Ordinance under Section 601 of the Municipalities Planning Code (MPC)[12] and that Section 603(i) provides that "zoning ordinances shall provide for the reasonable development of minerals in each municipality." 53 P.S. §10603(i). In turn, Section 107 of the MPC defines "minerals" as including "crude oil and natural gas." 53 P.S. §10107. The Board also stated that under Sections 603(g) and (h) and Section 604(5) of the MPC, "[z]oning ordinances must protect 'prime agricultural land' and encourage the continuity, development and viability of agricultural operations while also accommodating reasonable overall community growth. 53 P.S. §§10603(g) and (h), 10604(5)." R.R. at 1789a. The Board rejected "Daniels' view that oil and gas operations should be limited to industrial districts" because "it views residential as the preeminent use, to which all other uses are subordinate." Id. Rather, the Board found Sittig's testimony to be more persuasive and credible that "the need to balance interests and uses is a far better view of a mixed use zoning district, [which is] one of the aims of the MPC and indeed the balance spoken of in Article 1, Section 27 of the Pennsylvania Constitution." Id.

> As the Board explained:
>
> The Township Supervisors, through the passage of Ordinance 127, view oil and gas drilling activities as a way to help preserve agricultural activity. Their view is supported by the competent expert testimony of [] Sittig and the lay testimony of [] Morley and [] Hawkins Peterson. The Supervisors also view unchecked suburban growth as being associated with air and water pollution, traffic issues, and sewer and water costs.

---

[12] Act of July 31, 1968, P.L. 805, 53 P.S. §10601. Section 601 states that "[t]he governing body of each municipality . . . may enact, amend and repeal zoning ordinances to implement comprehensive plans and to accomplish any of the purposes of this act."

12

> Where [Objectors] view agriculture and residential to be nearly synonymous, with a perspective that favors residential, the Supervisors do not, instead viewing residential and agricultural as distinct and different uses in a mixed use district that must be balanced. The [Board] finds the Supervisors' view, espoused through the passage of Ordinance 127, to be credible.

R.R. at 1789a-1790a.

The Board found that "[t]he answer to whether the temporary industrial use poses a danger to the health, safety and welfare of the residents of [the] Township remains unanswered by the woefully inadequate scientific expert testimony presented in this case." R.R. at 1790a. The Board concluded that Objectors "failed to prove a health hazard to the community by their use of woefully inadequate scientific testimony" and, "[t]o the extent [that they] seek to limit oil and gas operations to a traditional industrial zone, the net effect would be to engage in the exclusionary zoning of oil and gas." *Id.*

The Board rejected Objectors' assertion that Ordinance 127 conflicts with the Township's Comprehensive Plan, concluding that "oil and gas operations are not specifically mentioned within the Comprehensive Plan" and that it "does not refer to the evaluation and development of [an] approval process for the production of natural resources." R.R. at 1791a. To the extent that they are inconsistent, the Board asserted that "a comprehensive plan is an abstract recommendation as to land utilization" so that "inconsistency with a comprehensive plan . . . cannot be a basis for a substantive challenge to a zoning ordinance." *Id.* (citations omitted). The Board stated that it "does not view *Robinson, supra,* as reversing prior case law on this issue" or "to require absolute adherence to an adopted comprehensive plan." *Id.*

13

Regarding Article 1, Sections 1 and 27, the Board explained that "[t]he substantive due process inquiry requires a balancing of land owners' rights and the public interest to be protected by the exercise of the police power" and that "[t]his balancing of interests is the same inquiry that must be made to determine whether an ordinance meets [the] requirements of Trustee [under Section 27]." R.R. at 1792a. The Board found that "[t]he totality of oil and gas drilling on a site, such as the Geyer [site], is not an industrial use, but it is instead a use traditionally exercised in agricultural areas, containing [temporary] components of an industrial use" and that "[t]o limit oil and gas drilling activities to a traditionally zoned industrial district based on their industrial incidents, is irrational." *Id.* at 1793a.

The Board explained that the Township's Supervisors "balanced the community's costs and benefits of oil and gas production as evidenced by, on one hand, Ordinance 127's exclusion of oil and gas activity from 'purely' residential zones, such as R-1, R-2 and PRD districts, to on the other hand, viewing oil and gas drilling as part and parcel of an agricultural district." R.R. at 1792a.[13] The

---

[13] The Board cited the following provisions in Ordinance 127 demonstrating this balancing of interests:

> Oil and gas activities are specifically excluded by Ordinance 127 from exclusively zoned residential districts, be it R-1, R-2 or within any PRD overlay district. The exclusion encompasses the three components of oil and gas drilling – well pads, processing plants and compressor stations. In addition, compressor stations and processing plants are not permitted in the R-AG district. The only oil and gas activity permitted in the R-AG mixed use district is an oil and gas well pad and its temporary industrial components. All of these limitations on oil and gas use evidence rational planning and a balancing of interests.

R.R. at 1793a.

14

Board noted the PRD overlay located in the R-AG Residential Agriculture District and that "[m]ixed use districts, and even seemingly incompatible mixed use districts with crowded residential areas, have been recognized as an acceptable planning tool." *Id.* (citation omitted). The Board stated:

> In mixed use districts of residential and agricultural districts, such as the epicenter R-AG district, it is rational to preserve agricultural districts to maintain a check on the growth of residential districts. Oil and gas drilling provides a financial mechanism by which the free market can preserve agriculture. Ordinance 127 therefore bears a substantial relationship to public health, safety and welfare as well as a balancing of interests.

*Id.* at 1793a-1794a.

The Board found that the burden was on Objectors and that they "failed to meet their burden that oil and gas drilling pads will injure their neighbors." R.R. at 1794a. The Board stated that the Township's Supervisors "acted in their role as trustee for future generations, as required by Article 1, §27 . . . by helping to preserve agricultural resources for future generations." *Id.* The Board concluded that "the effect of Ordinance 127 constitutes a balancing of the benefits of preserving agriculture including utilizing oil and gas use upon agricultural areas encompassing no more than 30% of the Township, and, by limiting suburban growth." *Id.* As a result, the Board denied Objectors' substantive challenge to Ordinance 127 and their appeal of the zoning permit.

Objectors appealed the Board's decision to the trial court and the trial court issued a stay[14] pursuant to Section 1003-A(d) of the MPC.[15] Rex, Geyer, and

---

[14] The trial court had previously issued and then vacated a preliminary injunction pursuant to Pa. R.C.P. No. 1531.

the Township intervened in Objectors' zoning appeal and appealed the trial court's stay order to this Court. The zoning appeal continued and the trial court ultimately affirmed the Board's decision without taking additional evidence and lifted the stay. Objectors, the Township, Rex, and Geyer then filed the instant appeals[16] of the trial court's affirmance of the Board's decision.[17]

---

**(continued…)**

[15] Added by Act of December 21, 1988, P.L. 1329, 53 P.S. §11003-A(d). Section 1003-A(d) states that "[t]he filing of an appeal in court under this section shall not stay the action appealed from, but the appellants may petition the court having jurisdiction of the land use appeals for a stay."

[16] This Court stayed the appeals of the trial court's stay order and *sua sponte* consolidated the land use appeals with Rex's and Geyer's appeals of the trial court's stay order; the Township discontinued its appeal of the trial court's stay order. We also designated Objectors as appellants in the consolidated appeals. The Board did not file an appellate brief, and Geyer joined in Rex's and the Township's appellate briefs.

[17] "In an appeal from a trial court's order affirming a decision of a zoning hearing board, where the trial court takes no additional evidence, our review is limited to considering whether the zoning hearing board abused its discretion or erred as a matter of law. The zoning hearing board abuses its discretion when it issues findings of fact that are not supported by substantial record evidence[.]" *In re Bartkowski Investment Group*, 106 A.3d 230, 237 (Pa. Cmwlth. 2014), *appeals denied*, 118 A.3d 1109 (Pa. 2015) (citation omitted). *See also 41 Valley Associates v. Board of Supervisors of London Grove Township*, 882 A.2d 5, 13 (Pa. Cmwlth. 2005), *appeal discontinued*, (Pa., No. 60 MAP 2006, filed March 21, 2007) ("On appeal, most of the arguments advanced by the parties focus on the trial court's opinion. However, we review *the Board* [*of Supervisor's*] *decision* to determine whether it committed an error of law and whether its necessary findings of fact are supported by substantial evidence. [Since most of the arguments advanced by the parties focus on the trial court's opinion rather than on the Board's decision, which is the subject of our review, our analysis departs from the arguments advanced by the parties].") (emphasis in original).

16

**I.**

Objectors first claim[18] that the trial court erred in failing to correctly apply a substantive due process analysis under Article 1, Section 1 because Ordinance 127 was not a valid exercise of the Township's police powers and places an incompatible industrial use in the R-AG Residential Agriculture District in violation of the MPC. Specifically, Objectors assert that Ordinance 127 has substantially similar problems to Act 13's zoning scheme that was held to be invalid by this Court in *Robinson I* wherein this Court determined that the placement of industrial uses in districts set aside for non-industrial uses makes zoning schemes irrational and unconstitutional. *See Robinson I*, 52 A.3d at 484 n.21, 485 n.23. They contend that Ordinance 127 is illogical, arbitrary, and discriminatory by permitting oil and gas development by right in agricultural and residential/agricultural zones and that it unduly disturbs their established expectations regarding their property rights, including public health, safety, and welfare. Likewise, Objectors submit that the trial court erred in its analysis of their MPC claims because Section 603 requires consistency with the Comprehensive Plan and protection of natural and historic features and resources, and Section 604 requires that ordinances be designed to provide adequate land for housing and to

_____

[18] Objectors initially assert that the trial court erred in holding that they could not challenge the validity of Ordinance 127. However, our review of the trial court's opinion demonstrates that this claim of error is based on a misconstruction of the opinion. *See* Trial Court 1/21/16 Opinion at 12. In any event, to the extent that the trial court may have erred in this regard, any error was harmless because the trial court considered Objectors' claims on the merits and it did not affect the outcome of their appeal. *See, e.g., Pennsy Supply, Inc. v. Zoning Hearing Board of Dorrance Township*, 987 A.2d 1243, 1251 (Pa. Cmwlth. 2009), *appeal denied*, 4 A.3d 1056 (Pa. 2010) ("We hold, however, that the trial court's reference to [*Butler v. Derr Flooring*, 285 A.2d 538 (Pa. Cmwlth. 1971),] in its original opinion was harmless error since the trial court affirmed the ZHB's decision that applied the appropriate burden of proof, and the error had no effect on the outcome of this case.").

promote proper emergency response and to prevent the loss of health, life or property from fire, flood, panic or other dangers.[19]

However, Objectors' claims in this regard are based on the faulty premise that Ordinance 127 introduced a new and incompatible industrial use into the R-AG Residential Agriculture Zoning District. As this Court has explained:

> In *MarkWest Liberty Midstream & Resources, LLC v. Cecil Township Zoning Hearing Board*, 102 A.3d 549 (Pa. Cmwlth. 2014), [*appeal denied*, 113 A.3d 281 (Pa. 2015)], the zoning board denied MarkWest's application for a special exception to operate a natural gas compressor station in the township's light industrial zoning district. Its proposed facility involved up to eight engines, surrounding sound structures, dehydration facilities, tanks, a vapor recovery unit, a flare and associated piping. The closest residence was 1,000 feet

---

[19] As the Pennsylvania Supreme Court has explained:

> When presented with a challenge to a zoning ordinance, the reviewing court presumes the ordinance is valid. The burden of proving otherwise is on the challenging party.
>
> A zoning ordinance is a valid exercise of the police power when it promotes public health, safety or welfare and its regulations are substantially related to the purpose the ordinance purports to serve. In applying that formulation, Pennsylvania courts use a substantive due process analysis which requires a reviewing court to balance the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of regulation on individual rights. The party challenging the constitutionality of certain zoning provisions must establish that they are arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare. Where their validity is debatable, the legislature's judgment must control.

*Boundary Drive Associates v. Shrewsbury Township Board of Supervisors*, 491 A.2d 86, 90 (Pa. 1985) (citations omitted).

18

from the proposed facility. The zoning board denied the application for the stated reason that MarkWest failed to establish that its facility would be similar to other uses permitted in the zoning district or that its impact would be equal to or less than that of other permitted uses. The trial court affirmed the board.

On appeal to this Court, MarkWest argued that its compressor station had the same general character as an "essential service," which was a use permitted in the light industrial district. The zoning ordinance defined "essential service" as follows:

> *The erection, construction, alteration, or maintenance, of gas, electrical, and communication facilities*; steam, fuel, or water transmission or distribution systems; and collection, supply, or disposal systems. Such systems may include poles, wires, mains, drains, sewers, pipes, sewage treatment plants, conduits, cables, fire alarm and police call boxes, traffic signals, hydrants, and similar accessories. This definition is not intended to include private commercial enterprises such as cellular communications facilities, but only those public facilities necessary for the health, safety, and general welfare of the community.[20]

---

[20] Similarly, Section 175.8 of the Township's Zoning Ordinance defines "essential services" as:

> The provision of distribution systems by public utilities, municipal or other government units regulated by the Public Utility Commission (PUC) or other governmental agencies of underground or overhead gas, electrical, steam or water pipes, sewers, conduit, fire alarm boxes, traffic signals, hydrants and other similar equipment and accessories in connection therewith, reasonably necessary for the furnishing of adequate services by such public utilities or municipal or governmental units or for the public health and safety or general welfare.

R.R. at 1582a.

*MarkWest*, 102 A.3d at 556 (emphasis added). The zoning board concluded that the MarkWest compressor was different from an "essential service" because it would not transmit natural gas to an "end user." *Id.* at 557. This Court rejected that conclusion because the zoning ordinance did not contain such a requirement. Rather, an "essential service" was defined as "public facilities necessary for the health, safety, and general welfare of the community." *Id.* at 557. Further, the zoning ordinance defined a "public service facility" as

> [b]uildings, power plants or substations, water treatment plants or pumping stations, sewage disposal or pumping plants, and other similar public service structures used by a *public utility . . ., whether publicly or privately owned*, or by a municipal or other government agency, including the furnishing of . . . gas . . . services.

*Id.* at 558-59 (emphasis in original). We concluded that MarkWest's compressor had the "same general character" as an "essential service." It was not necessary that the proposed use be the "same" as a permitted use but only that it be "similar."

*Gorsline v. Board of Supervisors of Fairfield Township*, 123 A.3d 1142, 1151-52 (Pa. Cmwlth. 2015), *appeal granted*, 139 A.3d 178 (Pa. 2016).

In *Gorsline*, Inflection Energy, LLC (Inflection) leased land from Donald and Eleanor Shaheen in Fairfield Township's RA-Residential Agriculture District and filed an application for a conditional use permit to construct and operate a natural gas well on the land. Because the Township's Zoning Ordinance did not specifically authorize natural gas wells, Inflection sought the permit under a "savings clause" that authorizes the Township's Board of Supervisors to grant a conditional use that is not specifically authorized so long as it is consistent with the uses permitted in the zoning district and with the public health and safety. The Board had previously granted conditional use approval for four other natural gas

20

wells in the RA District. The Board conducted a number of hearings at which a number of neighboring landowners (Neighboring Landowners), including Gorsline, appeared in opposition to the permit, but did not present any evidence. The Board determined that Inflection met its burden of proving that it met the requirements for a conditional use thereby creating a presumption that the proposed use was consistent with the general welfare and safety of the public. The Board held that the burden shifted to Neighboring Landowners, who failed to present any evidence to substantiate their concerns about their property values, drinking water quality, and increased truck traffic and noise. As a result, the Board granted the permit.

On appeal, the common pleas court did not receive additional evidence and held that Inflection did not meet its burden of satisfying the conditional use requirements and reversed the Board's grant of the permit. The court found that Inflection's application was too imprecise to determine whether the proposed well was a use similar to those expressly permitted in the RA District. The court noted that the RA District was intended for residential and farming uses, which are quiet uses and that the proposed well was not a compatible use citing the number of truck deliveries during the construction phase, the drilling rigs, and the installation of a water pipeline. The court found the expert testimony regarding noise inconsistent, and held that Inflection did not prove that the proposed use would not be detrimental to the public health, safety, and welfare of the neighborhood. Accordingly, the court granted Neighboring Landowners' appeal, nullifying the Board's decision granting the conditional use permit.

On appeal to this Court, we initially noted that "[t]he gravamen of Inflection's appeal is that its proposed use is similar to and compatible with uses

21

allowed in the RA District either as a matter of right or as a conditional use," and that the permitted and conditional uses in the RA District under the zoning ordinance ranged "from essential services and hunting camps to parking garages, offices, funeral homes and public service facilities." *Gorsline*, 123 A.3d at 1150. We stated that "Inflection claims that its proposed well is similar to a 'public service facility'" and "that its well will service the general public by producing natural gas for its use and consumption." *Id.* We also noted that "the Board has already permitted four other gas well pads within the RA District, which shows that Inflection's proposed use is compatible with other uses in the RA District." *Id.*

In initially holding that Inflection's proposed natural gas well use was similar to and compatible with other uses permitted in the RA District, we explained:

> *MarkWest* is directly on point. The Township's Zoning Ordinance defines a "public service facility" as follows:
>
> > The erection, construction, alteration, operation or maintenance of buildings, power plants or substations, water treatment plants or pumping station; sewage disposal or pumping plants and other similar public service structures by a utility, whether publicly or privately owned, or by a municipal or other governmental agency, including the furnishing of electrical, gas, communication, water supply and sewage disposal services.
>
> Zoning Ordinance, §2.2. Further, Section 4.2 of the Zoning Ordinance defines "essential services" as follows:
>
> > Public utility facilities that do not require enclosure in a building, including gas, electrical, steam, telephone, or water distribution systems;

22

and including related equipment such as poles, towers, wires, mains, sewers, pipes, conduits, cables, fire alarm boxes, police call boxes, traffic signals, hydrants and other similar equipment.

Zoning Ordinance, §2.2.

Precisely as in *MarkWest*, Inflection's proposed use satisfies the requirement set forth in 12.18.1 of the Zoning Ordinance that it "is similar to and compatible with other uses permitted in the zone where the subject property is located." Zoning Ordinance, §12.18.1. The evidence about Inflection's well was in no way rebutted, and the Board has already authorized Inflection's other wells in the RA District.

Proving that its proposed use is similar to and compatible with uses expressly permitted in the RA District is not dispositive. Inflection also had the burden to show that its proposed use does not "conflict with the general purposes of this [Zoning] Ordinance." Zoning Ordinance, §12.18.3. Again, its evidence was uncontradicted. Inflection argues that its well will not conflict with the general purpose of the Zoning Ordinance, which expressly authorizes the extraction of minerals. Zoning Ordinance, §§12.18.1, 12.18.3.

In holding otherwise, the trial court conflated the general purpose of the Zoning Ordinance with the requirement that the proposed use be similar to and compatible with other uses allowed in the RA District. The trial court also erred in focusing on the truck deliveries during the construction phase of the project because "[z]oning regulates the *use* of land and not the particulars of development and construction." *In re Thompson*, 896 A.2d 659, 671 (Pa. Cmwlth. 2006).

We hold that Inflection's proposed use met the threshold requirements set forth in Sections 12.18.1 and 12.18.3 of the Zoning Ordinance. It is similar to and compatible with the uses permitted in the RA District and does not conflict with the general purpose of the Zoning Ordinance.

23

123 A.3d at 1152-53 (footnote and citations to the record omitted and emphasis in original).

With respect to Inflection's assertion that it had demonstrated that the proposed use would not be detrimental to the public health, safety, and welfare, we stated:

> Inflection argues that the trial court erred in concluding that it did not prove that its natural gas well would "not be detrimental to the public health, safety and welfare of the neighborhood where it is to be located." Zoning Ordinance, §12.18. Inflection presented expert testimony on that issue, which the Board accepted. Neighboring Landowners presented no evidence to the contrary.
>
> * * *
>
> Nevertheless, the Board responded to the concerns of Neighboring Landowners by imposing numerous conditions related to roadway maintenance, traffic and parking. It also required Inflection to provide emergency contact information upon request, visually screen the well from the neighborhood and comply with all federal state and local permits and approvals.

*Id.* at 1153-54.

Based on the foregoing, we concluded:

> The trial court erred in holding that Inflection's proposed use was not *similar to* a public service facility, which is expressly permitted in the RA District and compatible with other uses permitted in the RA District. The trial court also erred in holding that Inflection's proposed use conflicted with the general purpose of the Zoning Ordinance, which specifically authorizes extraction of minerals. Finally, there was no probative evidence offered to show that Inflection's proposed well will present a detriment to the health and safety of the neighborhood. Inflection satisfied the requirements of Section 12.18 of the Zoning Ordinance.

24

*Id.* at 1154 (emphasis in original). The foregoing holdings in *Gorsline* and *Markwest* are instructive.[21]

As noted above, when Ordinance 125 was enacted by the Township in 2012, establishing the R-AG Residential Agriculture District, a permitted use from the inception of the district is the "public utilities, except buildings" use. Zoning Ordinance §175-244(A)(1)(h); R.R. at 1760a. Section 175.8(A)(1) and (5) of the Zoning Ordinance defines the "public utility" use, in relevant part, as "[a]ny person or corporation now or hereafter owning or operating in this commonwealth equipment or facilities for . . . [p]roducing, generating, transmitting, distributing or furnishing natural or artificial gas . . . for the production of light, heat or power to or for the public for compensation . . . [and t]ransporting or conveying natural or artificial gas, crude oil, gasoline or petroleum products . . . by pipeline or conduit for the public for compensation." R.R. at 1594a. Like the "public service utility" use permitted as a conditional use in the RA District in *Gorsline*, by adding the "oil and gas well site development" use to the R-AG Residential Agriculture District through Ordinance 127, the Township's Board of Supervisors merely added a use to the district that was similar to and compatible with an existing permitted "public utilities, except buildings" use.[22] Likewise, as in *Gorsline*, at the time of Ordinance

---

[21] It is well settled that this Court may affirm on any basis appearing in the record. *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 973 n.12 (Pa. Cmwlth. 2015) (citation omitted).

[22] The General Assembly has also recognized the compatibility between agricultural and oil and gas development uses in other contexts. *See* Section 14.1(c)(6)(i) of the Agricultural Area Security Law, Act of June 30, 1981, P.L. 128, added by Act of December 14, 1988, P.L. 1202, *as amended*, 3 P.S. §914.1(c)(6)(i) ("An agricultural conservation easement [purchased by the State Agricultural Land Preservation Board] shall not prevent . . . [t]he granting of leases . . . or the issuing of permits . . . for the exploration, development, storage or removal of . . . oil and gas by the owner of the subject land or the owner of the underlying . . . oil and gas or the owner **(Footnote continued on next page…)**

127's enactment, there were already three well pads in the Township's prior agricultural zoning district. *See* R.R. at 2194a, 2213a-2214a, 2573a-2575a.[23] Further, Objectors' reliance on the construction activity related to the "oil and gas well site development" use is misplaced "because '[z]oning regulates the *use* of land and not the particulars of development and construction.'" *Gorsline*, 123 A.3d at 1153 (citation omitted and emphasis in original).

---

**(continued…)**

of the rights to develop the underlying . . . oil and gas, or the development of appurtenant facilities related to . . . oil or gas development or activities incident to the removal or development of such minerals."); Section 6(c.1)(1) of the Pennsylvania Farmland and Forest Land Assessment Act of 1974, Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §5490.6(c.1)(1) ("Land subject to preferential assessment may be leased or otherwise devoted to the exploration for and removal of gas and oil, including the extraction of coal bed methane, and the development of appurtenant facilities, including new roads and bridges, pipelines and other buildings or structures, related to exploration for and removal of gas and oil and the extraction of coal bed methane.").

[23] Objectors' reference to "spot use" in *Robinson I*, 52 A.3d at 484 n.21, 485 n.23, was in the context of the statewide mandate of the invalid provisions of Act 13. In contrast, the "oil and gas well site development" use in Ordinance 127 is permitted in mixed-use districts in the Township. As noted above, the Board found that natural gas compressor stations are permitted uses in non-residential I-1, AG-A, AG-B, and C-3 Zoning Districts, but are not permitted in the R-AG Agriculture Residential District because it is within the Township's PRD district. R.R. at 1780a, 1793a. The Board properly concluded that "[t]he only oil and gas activity permitted in the R-AG mixed use district is an oil and gas well pad and its temporary industrial components. All of these limitations on oil and gas use evidence rational planning and a balancing of interests." *Id.* at 1793a. This is not an impermissible "spot use." *See Plaxton v. Lycoming County Zoning Hearing Board*, 986 A.2d 199, 211 (Pa. Cmwlth. 2009), *appeal denied*, 8 A.3d 900 (Pa. 2010) ("Here, Objectors' spot zoning and/or special legislation claims are unavailing. To that end, we observe that the property upon which [the lessee] proposes to construct its wind energy facility was not rezoned in a manner so as to subject it to unjustifiably different treatment from similar surrounding land. Indeed, the ordinance amendments did not rezone the property at issue at all; rather, the effect of the amendments is simply to permit, by right, wind energy facilities in all of the County's Agricultural, Countryside and RP zoning districts. Therefore, Objectors' spot zoning claim fails here.").

26

Additionally, there is substantial evidence supporting the Board's determination that the "oil and gas well site development" use is compatible with the other permitted agricultural and residential uses and that it will limit sprawl and protect agricultural land. R.R. at 2188a, 2193a, 2194a, 2207a- 2208a, 2214a, 2231a. *See also id.* at 693a-694a, 703a-705a, 2574a-2576a, 2581a-2582a.[24] This is consistent with the stated general purposes of Ordinance 127 and the R-AG Residential Agriculture District created by Ordinance 125. *Id.* at 34a, 1760a. As the Board explained, the Township's Supervisors "balanced the community's costs

---

[24] To the extent that Objectors' claims could be construed as asserting that oil and gas drilling is an "abnormally dangerous" or "ultra-hazardous" activity, thereby implicating strict tort liability, this assertion has been specifically rejected. For example, as a federal court has explained:

> [T]he evidence in the record developed by the parties contains numerous citations to governmental reports, data analysis, and expert commentary attesting to the Defendants' position that the risks from a properly drilled, cased and hydraulically fractured gas well are minimal. This evidence includes a report from the Pennsylvania General Assembly that referred to a study examining more than 200 water samples taken before and after drilling and hydraulic fracturing that revealed no major influences from gas well drilling or fracking. The evidence also indicates that Pennsylvania's [DEP] concluded that problems associated with natural gas drilling, to the extent they exist, 'can be mitigated by proper construction of gas wells.' Other evidence from within Pennsylvania and other states in which natural gas drilling occurs further supports the view that hydraulically fractured wells create, at most, relatively low risk to water supplies, and the Director of the DEP's Office of Oil and Gas Management attested that following a 'million experiments' from across the country, he had not found any instances of fracking interfering with groundwater resources.

*Ely v. Cabot Oil and Gas Corporation*, 38 F.Supp. 3d 518, 529 (M.D. Pa. 2014) (citations omitted).

and benefits of oil and gas production as evidenced by, on one hand, Ordinance 127's exclusion of oil and gas activity from 'purely' residential zones, such as R-1, R-2 and PRD districts, to on the other hand, viewing oil and gas drilling as part and parcel of an agricultural district."  R.R. at 1792a

Moreover, Objectors failed to sustain their burden of demonstrating by credible testimony that the presumptively valid Ordinance 127 is "arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare." *Boundary Drive Associates*, 491 A.2d at 90.  As noted above, the Board found that "[t]he answer to whether the temporary industrial use poses a danger to the health, safety and welfare of the residents of [the] Township remains unanswered by the woefully inadequate scientific expert testimony presented in this case," and concluded that Objectors "failed to prove a health hazard to the community by their use of woefully inadequate scientific testimony."  R.R. at 1790a. *See, e.g., Christman v. Zoning Hearing Board of the Township of Windsor*, 854 A.2d 629, 635 (Pa. Cmwlth. 2004) ("It was Landowners' burden to establish the zoning map amendment was arbitrary and unreasonable.  As discussed hereafter, the ZHB was unpersuaded by Landowners' vague proof on the issue, and it found Landowners offered no credible evidence that the Ordinance was arbitrary and unreasonable.  As the ZHB concluded Landowners failed to meet their burden based on credibility findings, no error is evident.") (citations omitted).

Finally, Section 603(g)(1), (h) and (i) of the MPC states that "ordinances shall protect prime agricultural land," "shall encourage the continuity, development and viability of agricultural operations," and "shall provide for the reasonable development of minerals." 53 P.S. §§10603(g)(1), (h), (i).  In turn, Section 107 of the MPC defines "minerals" as including "crude oil and natural

28

gas." 53 P.S. §10107. Likewise, Section 604(3) and (5) states that "[t]he provisions of zoning ordinances shall be designed . . . to preserve prime agriculture and farmland" while "accommodat[ing] reasonable overall community growth." 53 P.S. §10604(3), (5). The substantial evidence demonstrates that Ordinance 127 accomplishes the foregoing while limiting oil and gas development to certain zoning districts in the Township. The fact that such a use may conflict with the Township's Comprehensive Plan is not a basis upon which the Board may invalidate Ordinance 127. *See* Section 303(c) of the MPC, 53 P.S. §10303(c) ("[N]o action by the governing body of a municipality shall be invalid nor shall the same be subject to challenge or appeal on the basis that such action is inconsistent with, or fails to comply with, the provision of a comprehensive plan."). Based on the foregoing, the Board did not err in rejecting Objectors' substantive challenge to Ordinance 127 as violative of Article 1, Section 1 of the Pennsylvania Constitution and the trial court did not err in affirming this determination.

## II.

Objectors next claim that the trial court also failed to apply the relevant constitutional analysis for their Article 1, Section 27 claims. They argue that the Township failed to assess whether the ordinance would cause unreasonable "actual or likely degradation" of air or water quality. *See Robinson II*, 83 A.3d at 951-55. They contend that the Township also violated its fiduciary duty as trustee under Section 27 by issuing the permit without first considering the environmental effect of the action on the constitutionally protected features; failing to exercise prudence respecting the environment; treating all beneficiaries of the trust equally;

29

and protecting the natural environment over development and disturbance. *Robinson II*, 83 A.3d at 952, 957-58, 959, 973 n.55.

Objectors argue that Ordinance 127 suffers from the same infirmity of Act 13 that was stricken in *Robinson II*, *i.e.*, that it permits "industrial" oil and gas development in non-industrial zoning districts. However, the Supreme Court invalidated the municipal zoning provisions of Act 13 because the General Assembly usurped the municipalities' right to restrict oil and gas development from any zoning district, not because it permitted oil and gas development in non-industrial zoning districts. *Robinson II*, 83 A.3d at 980. Nevertheless, the Supreme Court recognized that Article 1, Section 27 "do[es] not require a freeze of the existing public natural resource stock; rather, . . . the duties to conserve and maintain are tempered by legitimate development tending to improve the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development." *Id.* at 958.

Moreover, this Court has held that "the [*Robinson II*] plurality's construction of Article 1, Section 27 [is] persuasive only to the extent it is consistent with binding precedent from this Court and the Supreme Court on the same subject." *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 108 A.3d 140, 156 n.37 (Pa. Cmwlth. 2015) (citations omitted). This Court stated that "[i]n the absence of a majority opinion from the Supreme Court or a decision from this Court overruling *Payne* [*v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973)], that opinion is still binding on this Court." *Id.* at 158.

In *Payne*, this Court established a test to determine whether governmental action implicates the provisions of Article 1, Section 27:

> Judicial review of the endless decisions that will result
> from such a balancing of environmental and social

30

concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

312 A.2d at 94.

We have explained that Article 1, Section 27 "places policymakers in the 'constant and difficult' position of 'weighing conflicting environmental and social concerns' and 'in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources.' To this end, we recently described [Article 1, Section 27] as 'a thumb on the scale, giving greater weight to the environmental concerns in the decision-making process' when 'environmental concerns of development are juxtaposed with economic benefits of development.'" *Funk v. Wolf*, 144 A.3d 228, 234 (Pa. Cmwlth. 2016) (citations omitted).

Ordinance 127 meets the *Payne* three-factor test. With respect to the first prong of the *Payne* test, under Section 175-155.2, any person or entity intending to engage in "oil and gas well site development" must comply with a number of requirements including: (1) provide an application including a copy of the Erosion and Sediment Control Plan (ESCGP-2) and Post-Construction Stormwater Management Plan prepared by a registered and licensed professional who has been trained by DEP's Office of Oil and Gas Management on erosion and sediment control and post construction stormwater management for oil and gas

31

activities; (2) if weight-restricted Township roads will be used, demonstrate compliance with any applicable Township ordinances, Department of Transportation regulations, and Township road bonding requirements, provide proof of bonding, and enter into a road maintenance agreement with the Township; (3) provide a copy of Highway Occupancy Permits and a driveway permit if entrance to the site is a Township road; (4) provide a copy of the Preparedness, Prevention, and Contingency Plan; (5) provide reimbursement for all fees permitted under Section 617.3(e) of the MPC;[25] (6) provide a copy of any applicable DEP permits relating to water storage and the impoundment must be reclaimed in accordance with DEP rules and regulations; and (7) comply with all DEP signage requirements. *See* R.R. at 38a-42a.

> Regarding the second prong of the *Payne* test, as the Board noted:

> > Oil and gas activities are specifically excluded by Ordinance 127 from exclusively zoned residential districts, be it R-1, R-2 or within any PRD overlay district. The exclusion encompasses the three components of oil and gas drilling – well pads, processing plants and compressor stations. In addition, compressor stations and processing plants are not permitted in the R-AG district. The only oil and gas activity permitted in the R-AG mixed use district is an oil and gas well pad and its temporary industrial components. All of these limitations on oil and gas use evidence rational planning and a balancing of interests.

R.R. at 1793a. *See also National Solid Wastes Management Association v. Casey*, 600 A.2d 260, 265 (Pa. Cmwlth. 1991), *aff'd per curiam*, 619 A.2d 1063 (Pa. 1993) ("The balancing of environmental and societal concerns, which the Commonwealth argues is mandated by Article I, Section 27, was achieved through

---

[25] Added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10617.3(e).

the legislative process which enacted Acts 97[26] and 101[27] and which promulgated the applicable regulations. Article I, Section 27 does not give the Governor the authority to disturb that legislative scheme. Neither does it give him the authority to alter [DEP]'s responsibilities pursuant to that scheme.").

Finally, with respect to the third prong of the *Payne* test, the Board explained that the Township's Supervisors "acted in their role as trustee for future generations, as required by Article 1, §27 . . . by helping to preserve agricultural resources for future generations;" "the effect of Ordinance 127 constitutes a balancing of the benefits of preserving agriculture including utilizing oil and gas use upon agricultural areas encompassing no more than 30% of the Township, and, by limiting suburban growth;" and Objectors "failed to meet their burden that oil and gas drilling pads will injure their neighbors." R.R. at 1794a. *See also Feudale v. Aqua Pennsylvania, Inc.*, 122 A.3d 462, 468 (Pa. Cmwlth. 2015), *aff'd per curiam*, 135 A.3d 580 (Pa. 2016) ("[Article 1, Section 27] requires [the Department of Conservation and Natural Resources (DCNR)] to first take into consideration the environmental impact of proposed actions. [The objector] has failed to specifically allege that DCNR did not comply with all applicable statutes and regulations, or that DCNR failed to keep the environmental impact to a minimum. Except for his oft-stated opinion about the aesthetic value of the Roaring Creek Tract, [the objector] has not alleged any facts suggesting that the 'environmental harm which will result from the [timbering] so clearly outweighs

---

[26] Solid Waste Management Act, Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.1-6018.1003.

[27] Municipal Waste Planning, Recycling and Waste Reduction Act, Act of July 28, 1988, P.L. 556, *as amended*, 53 P.S. §§4000.101-4000.1904.

the benefits to be derived therefrom that to proceed further would be an abuse of discretion.' Merely alleging that DCNR's proposed action will do harm to the Roaring Creek Tract is insufficient to establish a claim under [Article 1, Section 27]."). Based on the foregoing, the Board did not err in rejecting Objectors' substantive challenge to Ordinance 127 as violative of Article 1, Section 27 of the Pennsylvania Constitution and the trial court did not err in affirming this determination.[28]

## III.

Objectors next argue that the Board erred in its exclusion of evidence and rejection of admitted evidence, and that its decision is not supported by substantial evidence.[29] Specifically, Objectors assert that the Board abused its

---

[28] Objectors also contend that the Township's issuance of the permit violates the MPC and Article 1, Sections 1 and 27 of the Constitution and the permit should be invalidated on these bases. However, as outlined above, Objectors' claims in this regard are without merit so any additional contentions based on these claims are likewise without merit.

[29] As a corollary to this claim, Objectors assert that the record demonstrates the Board's clear bias in these proceedings in violation of due process. However, as this Court has previously noted:

> Importantly, "[w]hile an appearance of non-objectivity is sufficient to trigger judicial scrutiny, the significant remedy of invalidation often depends on something more tangible." "Before it can be said that a judge [or ZHB member] should have recused himself the record must demonstrate bias, prejudice, capricious disbelief or prejudgment . . . . If a judge [or ZHB member] thinks he is capable of hearing a case fairly his decision not to withdraw will ordinarily be upheld on appeal."

*Christman*, 854 A.2d at 633 (citations omitted). Prior to hearing the instant matter, all members of the Board acknowledged that they had granted subsurface leases to an oil and gas company prior to the filing of the instant matter; they had been on the Board for a decade or more; that they did not advocate any position with respect to Ordinance 127; that none of their immediate
**(Footnote continued on next page…)**

(continued…)

family members work for Rex, the Township, DRKN, or CAC; and that they could listen to the evidence and decide the matter in an unbiased manner applying the law as instructed by the Board's solicitor.  R.R. at 1845a-1846a.

In *Reilly v. Southeastern Pennsylvania Transportation Authority*, 489 A.2d 1291, 1299 (Pa. 1985), our Supreme Court set forth the following procedure to address the issue of judicial impartiality:

> The proper practice on a plea of prejudice is to address an application by *petition to the judge before whom the proceedings are being tried.  He may determine the question in the first instance*, and ordinarily his disposition of it will not be disturbed unless there is an abuse of discretion.
>
> Due consideration should be given by him to the fact that the administration of justice should be beyond the appearance of unfairness….  If the *judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion*.  This must be so for the security of the bench and the successful administration of justice . . . .  [(Citations omitted and emphasis added)].

The Court concluded that "[o]nce the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result.  In order to preserve an issue for appeal, [a party] ha[s] to make a timely, specific objection at trial *and* raise the issue on post-trial motions . . . ."  *Id.* at 489 A.2d at 1300 (citations omitted and emphasis added).

Thus, the issue of the improper conduct of a zoning hearing board must be first raised before the board, otherwise any allegation in this regard will be deemed to have been waived.  *Id.* *See also In re Appeal of Kreider*, 808 A.2d 340, 342 n.2 (Pa. Cmwlth. 2002) ("[W]hen the parties do not request that [the] common pleas [court] hear additional evidence, any issues or arguments not raised before the ZHB cannot be raised for the first time to common pleas and are waived.  *Society Created to Reduce Urban Blight v. Philadelphia Zoning Bd. Of Adjustment*, 804 A.2d 116, 119 (Pa. Cmwlth. 2002) . . . .").  Herein, Objectors have failed to direct this Court to where the issue of the improper conduct of the Board was raised by them in the proceedings before the Board.  *See*, *e.g.*, Pa. R.A.P. 2117(c), 2119(e).  As a result, in the absence of any indication that the issue of the Board's improper conduct was properly raised before the Board, any allegation of error in this regard has been waived for purposes of appeal.  *Reilly*; *Kreider*.

discretion in excluding from admission peer reviewed studies, federal or state publications, scientific review, and a Rex publication. Objectors also contend that the Board erred in accepting as credible Sittig's testimony, as Rex's expert on legal interpretation, while capriciously disregarding the testimony and reports of their expert witnesses, Carpenter, Parrish, Daniels, and Bowen, and the testimony and exhibits of two of their lay witnesses. Finally, Objectors claim that the Board abdicated its fact-finding role under Section 908(9) of the MPC.[30]

The Board properly noted that Section 908(6) of the MPC states that "[f]ormal rules of evidence shall not apply, but irrelevant, immaterial or unduly repetitive evidence may be excluded," and that evidence is limited by Section 908(5) which provides the parties have the right to cross-examine adverse witnesses on all relevant issues. 53 P.S. §10908(5), (6). Thus, although this Court has held that the Board is not bound by the rule precluding the admission of hearsay evidence, *Town & Country Management Corp. v. Zoning Hearing Board of the Borough of Emmaus*, 671 A.2d 790, 792 (Pa. Cmwlth. 1996), hearsay evidence must be sufficiently corroborated to be considered competent evidence. *Lake Adventure Community Association, Inc. v. Dingman Township Zoning Hearing Board*, 79 A.3d 708, 714 n.4 (Pa. Cmwlth. 2013), *appeal denied*, 84 A.3d 1065 (Pa. 2014). "Significantly, the legislature in the use of the word 'shall' in both the introductory paragraph and subparagraph (5) of Section 908 of the MPC made it mandatory that in all hearings before [the Board] the parties are entitled, as a matter of due process to, inter alia, 'cross-examine adverse witnesses.'" *In re*

---

[30] 53 P.S. §10908(9). Section 908(9) of the MPC states, in relevant part, that "[t]he board . . . shall render a written decision . . . . Where the application is contested or denied, each decision shall be accompanied by findings of fact and conclusions based thereon together with the reasons therefor."

36

*Appeal of Little Britain Township*, 651 A.2d 606, 615 (Pa. Cmwlth. 1994), *appeal denied*, 663 A.2d 696 (Pa. 1995).

With respect to the exhibits that the Objectors identify in their appellate brief, Exhibits A28, A69, and A94-A106, there is no indication that the documents or portions thereof sought to be admitted were sufficiently corroborated to constitute competent evidence. R.R. at 2175a, 2425a-2427a, 2625a-2629a. As a result, the Board did not err in sustaining the objections to these documents and excluding them from the record. *See In re Appeal of Little Britain Township*, 651 A.2d at 615 ("It admits of no argument that the trial court, in allowing the ZHB to receive into evidence in the remand hearing the written [federal Center for Disease Control] report and the written DE[P] orders, denied [the landowner] its fundamental right to test the validity of said evidence through cross-examination."). *See also* 37 Standard Pennsylvania Practice 2d §166:413 (2017) ("Where a report is properly objected to as hearsay and there is no corroborating evidence in support of the report, however, the report will not stand as support for a decision.") (citing *In re Appeal of Little Britain Township*).

Regarding the Board's credibility determinations, it is well settled that the Board, as fact-finder, is the sole judge of the credibility and the weight of the evidence presented. *Nettleton v. Zoning Board of Adjustment of the City of Pittsburgh*, 828 A.2d 1033, 1041 n.10 (Pa. 2003); *Taliaferro v. Darby Township Zoning Hearing Board*, 873 A.2d 807, 811 (Pa. Cmwlth.), *appeal denied*, 887 A.2d 1243 (Pa. 2005). As a result, the Board is free to reject even uncontradicted evidence that it finds lacking in credibility, including the testimony of an expert witness. *Nettleton*; *Taliaferro*. This Court's review of a Board's factual findings is limited to determining whether the findings of fact are supported by substantial

37

evidence. *Nettleton*; *Taliaferro*. This Court may not substitute its interpretation of the evidence for that of the Board. *Taliaferro.*

The Board did not err in finding Sittig's testimony to be more credible than Daniels' because such a determination is clearly within its province as fact-finder. The Board also did not err in admitting Sittig's testimony. The testimony of Daniels, Objectors' witness, consisted primarily of legal opinions with respect to the ordinance and his testimony was admitted over the Township's objection. R.R. at 1854a-1868a. By calling a witness to provide such legal opinions and conclusions, Objectors have waived any claim of error in this regard. *See, e.g., Tillery v. Children's Hospital of Philadelphia*, 156 A.3d 1233, 1243 (Pa. Super. 2017), ("Importantly, if a party presents evidence about a certain issue, then they open the door to rebuttal evidence that may not otherwise have been admissible. *See Duchess v. Langston Corp.*, 709 A.2d 410, 412 (Pa. Super. 1998), [*aff'd*, 769 A.2d 1131 (Pa. 2001)]."). Moreover, the Board specifically "reserve[d] to itself . . . any decision as to the questions of law" in this case. R.R. at 1774a. As a result, any purported error in this regard is harmless. *Pennsy Supply, Inc.*, 987 A.2d at 1251.

Additionally, the Board did not capriciously disregard the testimony of Carpenter, Bowen, Parrish, or Daniels or the evidence in the 41 exhibits introduced by them without objection.[31]    In *Kiskadden v. Pennsylvania*

---

[31] As this Court explained:

"Review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." Capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence. Where

**(Footnote continued on next page…)**

38

*Department of Environmental Protection*, 149 A.3d 380, 401 (Pa. Cmwlth. 2016), this Court explained that it is a rare instance where we will disturb an adjudication based on capricious disregard. "The express consideration and rejection of evidence is, by definition, not capricious disregard." *Taliaferro*, 873 A.2d at 815 (citation omitted). The objections to the reports of these witnesses were sustained because they were repetitive and cumulative. *See Curtis Investment Company v.*

---

**(continued…)**

> substantial evidence supports the findings, and those findings in turn support the conclusions, it should remain a rare instance where an appellate court disturbs an adjudication based on capricious disregard.
>
> We may conclude that a fact-finder has capriciously disregarded competent evidence "when the unsuccessful party below has presented 'overwhelming evidence' upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence." "In other words, where there is strong 'critical' evidence that contradicts evidence supporting a contrary determination, the adjudicator must provide an explanation as to how it made its determination."
>
> However, the fact-finder "is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected." The pertinent inquiry is whether the Board's findings are supported by substantial evidence. "The findings need only be sufficient to enable the Court to determine the questions and ensure the conclusions follow from the facts."

*Kiskadden v. Pennsylvania Department of Environmental Protection*, 149 A.3d 380, 401 (Pa. Cmwlth. 2016), *appeal denied*, ___ A.3d ___ (Pa. No. 480 WAL 2016, filed May 2, 2017) (citations omitted).

39

*Zoning Hearing Board of the Borough of West Mifflin*, 592 A.2d 813, 814 (Pa. Cmwlth. 1991) ("The refusal to admit cumulative evidence is not error. *Smith v. Commonwealth*, [470 A.2d 1125 (Pa. Cmwlth. 1984)]."). With respect to their testimony, the Board outlined the objective bases to reject the testimony of these witnesses as not credible. *See* R.R. at 1773a, 1781a-1782a, 1783a-1785a. As a result, these credibility determinations will not be disturbed on appeal.

Lastly, the Board did not abdicate its fact-finding role as required by Section 908(9) of the MPC. The Board's "opinion is sufficient if it provides an adequate explanation of its resolution of the factual questions involved, and sets forth its reasoning in such a way as to show its decision was reasoned and is not arbitrary." *Taliaferro*, 873 A.2d at 816. Where the Board's decision "is clear and substantially reflects application of the law governing" the issues to be considered, "the decision is sufficient to enable effective review." *Id.* As outlined above, the Board made specific findings relative to Objectors' claims regarding the validity of Ordinance 127 and the issuance of the zoning permit. *See id.* ("Here, the Board made specific findings and conclusions concerning the criteria required to grant the requested variance. In addition, the Board included a discussion in which it explained its rationale for resolving evidentiary conflicts and credibility issues . . . . As a result, we reject Objectors' argument that the Board's findings and conclusions are inadequate.").

## IV.

Finally, Rex and Geyer claim that the trial court erred in granting a stay under Section 1003-A(d) of the MPC. However, "[t]he general rule with respect to the issue of mootness is that an actual case or controversy must exist at

all stages of appellate review." *Pagnotta v. Pennsylvania Interscholastic Athletic Association, Inc.*, 681 A.2d 235, 237 (Pa Cmwlth. 1996), *appeal denied*, 693 A.2d 968 (Pa. 1997). "[W]here '[i]ntervening changes in the factual matrix of a pending case' occur which eliminate an actual controversy and make it impossible for the court to grant the requested relief, the case will be dismissed as moot." *Id.* (citation omitted). It is undisputed that the trial court has vacated the stay and that any activity prohibited thereunder has commenced. As a result, the appeals of the trial court's order granting the stay are moot.[32]

Accordingly, the trial court's order affirming the Board's decision is affirmed; Rex's and Geyer's appeals of the trial court's vacated order granting a stay under Section 1003-A of the MPC are dismissed as moot.

_____
MICHAEL H. WOJCIK, Judge

Judge McCullough concurs in the result only.

---

[32] As this Court has explained, "[a]lthough the parties have not argued mootness, we may raise it *sua sponte*." *Utility Workers Union of America, Local 69 v. Public Utility Commission*, 859 A.2d 847, 849 (Pa. Cmwlth. 2004) (citation omitted). Moreover, we reject Rex's and Geyer's assertion that the appeals are not moot because review of such a stay order under Section 1003-A will evade review. The issues raised herein would have been reviewed by this Court but for the joint application to remand the record to the trial court for consideration of that record in the land use appeal thereby precluding our review before the claims became moot.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Delaware Riverkeeper Network,                :
Clean Air Council, David Denk,              : No. 1229 C.D. 2015
Jennifer Chomicki and Joann Groman          :
                                             :
                                             :
            v.                               :
                                             :
                                             :
Middlesex Township Zoning                    :
Hearing Board                                :
                                             :
                                             :
            v.                               :
                                             :
                                             :
R.E. Gas Development, LLC and                :
Middlesex Township                           :
                                             :
                                             :
Appeal of: R.E. Gas Development, LLC :

Delaware Riverkeeper Network,                :
Clean Air Counsel, David Denk               : No. 1323 C.D. 2015
and Jennifer Chomicki                        :
                                             :
                                             :
            v.                               :
                                             :
                                             :
Middlesex Township Zoning                    :
Hearing Board                                :
                                             :
                                             :
                                             :
            v.                               :
                                             :
                                             :
R.E. Gas Development, LLC and                :
Middlesex Township and                       :
Robert G. Geyer                              :
                                             :
                                             :
Appeal of: Robert G. Geyer                   :

Delaware Riverkeeper Network,          :
Clean Air Council, David Denk,         : No. 2609 C.D. 2015
Jennifer Chomicki, and Joann           :
Groman,                                :
                                       :
                    Appellants         :
                                       :
          v.                           :
                                       :
Middlesex Township Zoning              :
Hearing Board                          :
                                       :
          v.                           :
                                       :
R.E. Gas Development, LLC,             :
Middlesex Township, and Robert G.      :
Geyer                                  :

O R D E R

AND NOW, this 7th day of June, 2017, the order of the Butler County Court of Common Pleas dated November 19, 2015, at No. 15-10429, docketed at No. 2609 C.D. 2015, is AFFIRMED. The above-captioned appeals docketed at Nos. 1229 C.D. 2015 and 1323 C.D. 2015 are DISMISSED as moot.

_____
MICHAEL H. WOJCIK, Judge